UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

UNITED STATES OF AMERICA,

        Plaintiff,

                                                  Case No. 20-20350

v.

TEVIN DUPLESSIS,

        Defendant.
_____/

**OPINION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS**

Before the court is Defendant Tevin Duplessis's motion to suppress evidence (a handgun and ammunition) obtained from the search of a vehicle's trunk. (ECF No. 58.) Police officers responding to an early-morning 911 call located Defendant sitting alone in a black Nissan Altima with a Florida license plate; his car and general appearance matched a description given by two 911 callers minutes earlier from a house just two blocks away. The callers told dispatch that the driver had poured sugar into a car's gas tank and, more importantly, had discharged shots at his girlfriend. Because officers searched the vehicle based mainly on information provided by the two 911 callers, Defendant contends there was not sufficient particularized probable cause supporting a complete search of the Nissan. The motion has been fully briefed, and the court finds that a hearing on the matter is not necessary. E.D. Mich. L.R. 7.1(f)(2). For the reasons explained below, the court will deny the motion.

## I. BACKGROUND

Defendant has been charged with felon in possession of a firearm, a violation of 18 U.S.C. 922(g)(1). (ECF No. 20.) Starting at 2:31 a.m. on April 7th, 2020, Detroit Police received three 911 calls from two different female callers requesting police assistance at 19356 Sussex Street, Detroit, Michigan. The first caller stated that "her best friend's boyfriend had put sugar in [the caller's] gas tank." (ECF No. 61, Ex. 2.) The caller gave her name and sounded quite agitated throughout the call. (*Id.*)

At 2:38 a.m., dispatch received a second call from a different female caller (police later learned she was a minor); the caller stated that "my cousin's boyfriend put sugar in her best friend's car," and that "he put his hands on my cousin and he shot at her" before driving away. (ECF No. 61, Ex. 3.) After leaving, the suspect had called someone at the home "threatening to come back and shoot up the house." (*Id.*) The second caller also indicated that she did not know the suspect's name but that the dispute was "happening now," and she described the suspect as "a black male" driving "a black Nissan."(*Id.*) Because she took a picture of the Nissan's Florida license plate with her phone, she was able to provide a plate number to the dispatcher. (*Id.*) As the caller talked with the dispatcher, screaming could be heard in the background. (*Id.*)

The second caller placed another call to 911 at 2:43 a.m. to correct the last digits of the plate number she had previously provided. She stated that the suspect was still on the phone with someone at the home and threatening to return. (ECF No. 61, Ex. 4.) The caller also indicated that the car "was a rental" and provided her name. (*Id.*) Unredacted versions of all three recordings have been provided to the court.

As the first two responding scout cars turned onto Sussex from W. 7 Mile Road, they "observed a black Nissan parked on Sussex facing southbound just north of 7 Mile" occupied by a single black male. (ECF No. 61-6, PageID.450, 454, 457.) The car's engine was running and it was parked next to a closed floral business. (*Id.*) One of the officers checked the rear of the car to confirm it had the reported Florida license plate number; once the plate was verified, the officers asked Defendant to step out of the 2019 Nissan Altima and placed him in handcuffs. (*Id.*, PageID.457.)

While officers were at the scene, a black female—who Defendant's briefing describes as his sister—"came up to the location" and "stated she wanted her keys from [Defendant's] vehicle." (*Id.*, PageID.454.) When questioned by the officer about recent events, she replied by stating that "nothing happened." (*Id.*) She also indicated that she did not own a handgun. (*Id.*)

One of the officers then conducted a search of the vehicle to "check for a gun" and recovered a loaded 9mm Glock handgun with a spent round in the chamber and a second loaded magazine in the trunk. (*Id.*, PageID.457.) The officers then placed Defendant under arrest and impounded the car. (*Id.*)

Some of the officers responding to the call proceeded to 19356 Sussex Street, less than two blocks from Defendant's location. (*Id.*, PageID.455.) They recovered spent casings from the porch and live ammunition from the yard.[1] (*Id.*) At the home, they spoke with "IO-1," who placed the first call to 911. She told officers she did not know who placed sugar in her car's gas tank and declined to make a report about it. (*Id.*)

---

[1] The government has attached an exhibit indicating that a subsequent investigation by the ATF has linked two of the shell casings to the gun recovered from the trunk of the Nissan. (*See* ECF No. 16-7.)

Officers also spoke to "IO-2," who confirmed that Defendant had both poured sugar into a car's gas tank and fired shots out front of the home. (*Id.*) But IO-2 stated that she did not directly witness either incident because they occurred before she arrived at the location. (*Id.*) IO-2 stated that IO-1 had told her what had happened. (*Id.*)

Defendant now moves to suppress all evidence recovered and other fruits of the car's search. (*See* ECF No. 58.)

## II. STANDARD

The Fourth Amendment of the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." The purpose of the Fourth Amendment is "to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." *Taylor v. City of Saginaw*, 922 F.3d 328, 332 (6th Cir. 2019) (quoting *Camara v. Mun. Court of San Francisco*, 387 U.S. 523, 528 (1967)). "[W]hat the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures." *Terry v. Ohio*, 392 U.S. 1, 9 (1968) (quoting *Elkins v. United States*, 364 U.S. 206, 222 (1960)).

The Fourth Amendment "contains no provision expressly precluding the use of evidence obtained in violation of its commands." *Herring v. United States*, 555 U.S. 135, 139 (2009) (quoting *Arizona v. Evans*, 514 U.S. 1, 10 (1995)). Over the course of many years, the Supreme Court developed the "exclusionary rule," which "forbids the use of improperly obtained evidence at trial." *Id.* The rule is "designed to safeguard Fourth Amendment rights generally through its deterrent effect" and is not a "necessary consequence of a Fourth Amendment violation." *Id.* at 139–40, 141 (quoting *United*

*States v. Calandra*, 414 U.S. 338, 348 (1974)); *Davis v. United States*, 564 U.S. 229, 236–37 (2011) (citations removed) ("Exclusion is not a personal constitutional right, nor is it designed to redress the injury occasioned by an unconstitutional search. The rule's sole purpose . . . is to deter future Fourth Amendment violations.").

The exclusionary rule serves to "prohibit [the] introduction into evidence materials seized during an unlawful search, and of testimony concerning knowledge acquired during an unlawful search." *United States v. Howard*, 621 F.3d 433, 451 (6th Cir. 2010) (quoting *Murray v. United States*, 487 U.S. 533, 536–37 (1988)). It also prohibits "the introduction of derivative evidence, both tangible and testimonial, that is the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search, up to the point at which the connection with the unlawful search becomes so attenuated as to dissipate the taint." *Id.*

## III. DISCUSSION

A warrantless search is *per se* unreasonable unless it falls into one of the established exceptions. *See Katz v. United States*, 389 U.S. 347, 357 (1967). "The government bears the burden of demonstrating an exception to the warrant requirement." *Taylor v. City of Saginaw*, 922 F.3d 328, 334 (6th Cir. 2019) (citing *United States v. Jeffers*, 342 U.S. 48, 51 (1951)). While the government acknowledges the officers searched Defendant's Nissan Altima without a warrant, the government argues that the officers could legally search the vehicle under the "automobile exception" because the information possessed by the officers gave them probable cause to search the car for evidence of the recently reported assault. (*See* ECF No. 61.)

The Sixth Circuit has adopted an automobile exception to the Fourth Amendment. *See United States v. Smith*, 510 F.3d 641, 647-48 (6th Cir. 2007). Under this exception, "police officers may conduct a warrantless search of a vehicle if they have 'probable cause to believe that the vehicle contains evidence of a crime.'" *Id.* at 647 (quoting *United States v. Lumpkin*, 159 F.3d 983, 986 (6th Cir. 1998)).

"A police officer has probable cause to conduct a search when the facts available to [the officer] would warrant a person of reasonable caution in the belief that contraband or evidence of a crime is present." *Florida v. Harris*, 568 U.S. 237, 243 (2013) (alterations and internal quotation marks omitted). "Probable cause deals with probabilities and depends on the totality of the circumstances." *D.C. v. Wesby,* 138 S. Ct. 577, 586 (2018) (internal quotation marks omitted). Therefore, "[p]robable cause is not a high bar" and "is a fluid concept that is not readily, or even usefully, reduced to a neat set of legal rules." *Id.* (internal quotation marks omitted). Facts must be considered together, not apart, since "the whole is often greater than the sum of its parts." *Id.* Finally, probable cause "does not require officers to rule out a suspect's innocent explanation for suspicious facts." *Id.* Instead, "the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts." *Id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 244 n.13 (1983)).

In the context of the automobile exception, courts have consistently found probable cause where "there is a fair probability that contraband or evidence of a crime will be found" in a vehicle. *United States v. Wright*, 16 F.3d 1429, 1437 (6th Cir. 1994) (quoting *Gates*, 462 U.S. at 238).

While Defendant moves to suppress evidence (mainly weapons and ammunition) obtained during the warrantless search of his car, he does not contest the validity of the recorded 911 calls introduced as evidence, nor does he directly challenge any of the facts as recounted by the officers in their reports.[2] Instead, he contends "that although there may have been grounds to detain and question him, there was no [probable cause] to search the trunk." (ECF No. 58, PageID.404.) Defendant's argument is premised largely on the idea that the responding officers, who located Defendant in the Nissan, could not rely on the 911 calls to establish probable cause for a search of the car without significant independent evidence corroborating that a crime occurred. (*Id.*, PageID.405-06.) While acknowledging that no specific statistics exist, they allege that "false or exaggerated calls to the Detroit 911 call center are common." (*Id.*) Defendant points out that when the responding officers encountered Defendant, they had not yet made it to the scene of the alleged assault and had therefore not yet found the shell casings that were later recovered. Consequently, they did not yet possess any physical evidence independently suggesting that a crime occurred. (*Id.*) And Defendant argues that the contemporaneous statement of his sister—telling police that "she did not know what happened" when questioned before the search[3]—further reduced the probability

---

[2]  Defendant's brief expressly states that "Defendant submits that the attached Detroit Police Department reports, as well as the video recordings. . . obviate the need for an evidentiary hearing." (ECF No. 58, PageID.411.) Given the lack of an apparent evidentiary dispute here, the court concludes that no evidentiary hearing is needed. *See United States v. Ickes,* 922 F.3d 708, 710 (6th Cir. 2019) ("An evidentiary hearing [on a motion to suppress] is required only if the motion is sufficiently definite, specific, detailed, and non-conjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in question.")(quotation omitted).

[3]  It is not clear to the court if Defendant's sister approached the responding officers before or after the search of the vehicle occurred, so for the sake of argument, the court assumes she made contact with the officers before the search.

that the crime described on the 911 calls had actually occurred. (*Id.*) He contends that the officer's original contact with him should have been for initial "investigatory purposes only" and that officers should have acquired more evidence that a crime actually occurred before they could search the vehicle. (*Id.*, PageID.407.)

This argument must be rejected, however, because courts have routinely found that the statements of 911 callers can establish probable cause for both arrests of drivers and warrantless searches under the "vehicle exception." *See United States v. Pasquarille,* 20 F.3d 682, 687 (6th Cir. 1994) (holding that an officer had probable cause to search a vehicle for drugs based on a tip from an eyewitness informant stating that "an individual was attempting to sell drugs at a nearby truck stop . . ., the vehicle in the attempted sale involved was a light-colored van with a step top, and the vehicle bore a Florida license plate ending with the characters '91E.'"); *United States v. Lindsey*, 482 F.3d 1285, 1288 1293 (11th Cir. 2007) (holding probable cause existed to search an SUV for weapons after a single 911 caller reported "that four black males were loading guns and putting them in a large white SUV" when, by the time they conducted the search, the officers also knew the "[d]efendant [driver] was a felon and that he owned the SUV."); *Harrison v. Inc. Vill. of Freeport*, 498 F. Supp. 3d 378, 392 (E.D.N.Y. 2020) (finding that 911 caller's description of a suspect and his car—who violently attempted to enter her car in a parking lot then tailed her—was sufficient to establish probable cause for the suspect's arrest); *United States v. Dalmau,* No. 14-CR-165A, 2016 WL 5919836, at *5 (W.D.N.Y. Oct. 11, 2016) (citing *United States v. Harple*, 202 F.3d 194, 198 (3d Cir. 1999) ("[P]robable cause to stop a vehicle and to arrest its occupants can

8

rest on 911 calls and witness statements describing a vehicle and placing it at the scene of a crime that just recently occurred.").

Here, by the time the responding officers searched the Nissan driven by Defendant, they possessed enough information for a reasonable officer to conclude there was "a fair probability" that evidence of a crime was present in the car. *See Wright*, 16 F.3d at 1437. The responding officers were acting on reports from two different individuals (who both provided their names to the dispatcher) indicating that an unnamed "boyfriend" had just engaged in assaultive behavior at the home. (ECF No. 61, Ex Nos. 2, 3.) The second caller explicitly indicated that Defendant had "put hands on my cousin and shot at her" and that he had just threatened "to com[e] back and shoot[] up the house." (*Id.*, Ex No. 3.) This caller was able to provide a description of the suspect (black male) and the car that he was in (a black Nissan with Florida plates), and she even gave a plate number for the car. (*Id.*, Ex Nos. 3, 4.)

This description directly matched Defendant, who was located by responding officers in a Black Nissan Altima with Florida plates, less than two blocks from the house. Compared to other cases listed above, where courts have found probable cause for a warrantless search pursuant to the "automobile exception," the callers' reports, combined with the timing of events, leads only to a conclusion that a reasonable officer would have found probable cause for a search, based on the totality of the circumstances here.

The probability that the 911 calls were a false report is especially low in this instance because the calls were not anonymous, they were close in time to the alleged crime, and were made by two different callers who both sounded credible. *See United*

9

*States v. Tagg,* 886 F.3d 579, 589 (6th Cir. 2018) (quoting *Wesby*, 138 S.Ct. at 588) ("[P]olice need not 'rule out a suspect's innocent explanation for suspicious facts' in order to establish probable cause."). The fact that Defendant's sister—who was near the scene of the arrest—stated that she "did not know" what had occurred did not change the probability, one way or another, that evidence of a crime would be found in the car driven by Defendant. Nor does the fact that Defendant's girlfriend, and others present at the house, *later* denied direct knowledge of the assault change what the officers knew at the time of the search. This is a clear case where probable cause existed for a search of a vehicle under the automobile exception.

## IV. CONCLUSION

The court finds that the affidavit is sufficient to establish probable cause for a warrantless search of the Nissan driven by Defendant under the automobile exception. Therefore, evidence recovered as a result of the search cannot be suppressed. For these reasons,

IT IS ORDERED that Defendant's "Motion to Suppress Evidence" (ECF No. 58) is DENIED.

s/Robert H. Cleland         /<br>
ROBERT H. CLELAND<br>
UNITED STATES DISTRICT JUDGE

Dated:  December 22, 2021

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, December 22, 2021, by electronic and/or ordinary mail.

s/Lisa Wagner         /<br>
Case Manager and Deputy Clerk<br>
(810) 292-6522

S:\Cleland\Cleland\AAB\Opinions and Orders\Criminal\20-20350.DUPLESSIS.Motion.to.supress.AAB.RHC.docx

10